# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TERRY KELLY, derivatively and on behalf of OCULAR THERAPEUTIX, INC., | |
| Plaintiff, | C.A. No. _____ |
| v. | |
| AMARPREET SAWHNEY, ERIC ANKERUD, JASWINDER CHADHA, JAMES GARVEY, JEFFREY S. HEIER, RICHARD L. LINDSTROM, W. JAMES O'SHEA, BRUCE PEACOCK, CHARLES WARDEN, SV LIFE SCIENCES FUND, IV, LP, and SV LIFE SCIENCES FUND IV STRATEGIC PARTNERS, LP, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| OCULAR THERAPEUTIX, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Terry Kelly ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Ocular Therapeutix, Inc. ("Ocular" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Amarpreet Sawhney, Eric Ankerud, Jaswinder Chadha, James Garvey, Jeffrey S. Heier, Richard L. Lindstrom, W. James O'Shea, Bruce Peacock, and Charles Warden (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Ocular, unjust enrichment, and waste of corporate assets, and against SV Life Sciences Fund, IV, LP and SV Life Sciences Fund IV Strategic Partners, LP (together, the "SV Entities"), for unjust enrichment due to breach of

1

fiduciary duty. As for his complaint against the Individual Defendants and the SV Entities, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ocular, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of Ocular's directors and officers between March 10, 2016 and on or about August 7, 2017 (the "Relevant Period").

2.      Ocular is a biopharmaceutical company which focuses on developing and commercializing therapies for diseases and conditions relating to the eyes in the United States using proprietary hydrogel platform technology. DEXTENZA is one of the Company's two leading products. The Company has completed three Phase 3 clinical trials for the treatment of post-surgical ocular pain and inflammation with DEXTENZA. DEXTENZA is also in Phase 3 clinical development for allergic conjunctivitis, and in Phase 2 clinical trials for the treatment of inflammatory dry eye disease.

3.      Ocular is currently seeking FDA approval of a New Drug Application ("NDA") for DEXTENZA for the treatment of post-surgical ocular pain.

4.      The Company received a Form 483 from the U.S. Food and Drug Administration (the "Initial Form 483") in February 2016. The FDA uses Form 483 to communicate and document concerns discovered during facility inspections.

5.      On July 25, 2016, the Company announced it had received a Complete Response Letter from the FDA regarding its NDA for DEXTENZA.

6.      On January 23, 2017, the Company announced it had resubmitted its NDA for DEXTENZA.

7.      On May 5, 2017, the Company announced in a press release that it had "received an FDA Form 483 containing inspectional observations focused on procedures for manufacturing processes and analytical testing, related to manufacture of drug product for commercial production." (the "Second Form 483"). The phrase "drug product for commercial production" referred to DEXTENZA.

8.      Also on May 5, 2017, the Company held an earnings conference call. During the call Defendant Ankerud confirmed the Company's receipt of the Second Form 483. He stated, *inter alia*, that, "[the] FDA completed the re-inspection of our facility as part of the NDA review late yesterday afternoon. As [Defendant Sawhney] mentioned, 483 was issued." Defendant Ankerud also misleadingly touted that the Company "feel[s] quite comfortable that we have the situation under control and we are preparing responses to the 483 as of this morning in anticipation of responding within 15 calendar days to the agency." Defendant Ankerud went on to state that Ocular "expect[s] that we can resolve the 483 issues in a timely manner."

9.      During the May 5, 2017 call, Defendant Sawhney emphasized the Company's lack of concern regarding the Second Form 483 issues. Speaking for Defendants and the Company,

Defendant Ankerud said: "we believe that each of the observations raised by FDA during this continuous improvement review of our **fully developed manufacturing process** are handled well and will be resolved in our response to FDA." Defendanat Sawhney further assured investors that manufacturing was in a "fully developed mode."

10. *Seeking Alpha* published an article authored by a hedge fund manager specializing in healthcare stocks on July 6, 2017 (the "July Exposé") that detailed the multiple manufacturing issues with DEXTENZA, stating that Ocular management "has been misleading investors about manufacturing," and specifically referenced two separate 483s that Ocular received regarding DEXTENZA.

11. Also on July 6, 2017, *STAT*, a health sciences investigative journal run by Boston Globe media, published an article on the Company claiming that based on a finding of product contamination, including aluminum, by an FDA inspector during a visit to the Company's manufacturing facility, the FDA could reject DEXTENZA.

12. On this news, Ocular shares dropped to $7.12 per share on July 7, 2017, or 25.05%, on an extraordinary trading volume of 7.4 million shares. This decline represents an approximately $70 million loss in market value. Ocular's stock presently trades just above $4 per share, far below the 52 week high of $11.79.

13. Several securities fraud class actions seeking damages against the Company and its top officers have been filed.

14. Ocular issued a press release on July 10, 2017 stating that it had submitted an amendment to its DEXTENZA submission to the FDA. Recognizing that its responses to the Second Form 483 would necessarily delay the FDA approval of DEXTENZA, Ocular requested

a three-month extension to the FDA's approval target date of July 19, 2017 as part of this amendment.

15.     The Company issued a press release after the close of trading on July 11, 2017, announcing that the FDA had denied Ocular's NDA for DEXTENZA, stating that the FDA "determined that it cannot approve the NDA in its present form."

16.     On this disclosure, Ocular shares fell $1.90 per share, or over 25%, in after-hours trading before the market opened on July 12, 2017.

17.     Following a repeated FDA review of Ocular's manufacturing facilities, it has been found that Ocular has not remedied manufacturing defects. In particular, the most recent review concerned, in part, contamination of DEXTENZA batches by aluminum particles. The FDA has studied aluminum contamination, noting that exposure can lead to toxic reactions, especially in persons with impaired kidney function, which is not an uncommon condition in the elderly. Moreover, aluminum exposure can cause a variety of other ills, including central nervous system issues and bone toxicity.

18.     Foreshadowing these events, the Company announced on June 22, 2017 that CEO Sawhney would step down as CEO no later than September 2017, and would assume the role of Executive Chairman. Thereafter, Antony Mattessich became CEO on August 1, 2017.

19.      New CEO Mattessich essentially *repudiated all of Ocular's prior statements* In a conference call held on August 8, 2017, while acknowledging that he could not speak with any "granularity" about precisely what needed to be done to address the FDA's concerns. Mattessich stated any indications that Ocular had identified the source of its particulate problems amounted to nothing more than a "presumption," and a "root cause" analysis was necessary to truly

5

understand the issue. These statements were completely contrary to Sawhney's previous assurances that manufacturing was in a "fully developed mode." Indeed, Mattessich stated that if and when Ocular believed it had the issue under control, he was not even sure how many batches Ocular would have to produce to satisfy the FDA that the infiltration issue had been adequately addressed.

20.     In breach of their fiduciary duties, and in bad faith, the Individual Defendants made and/or caused or permitted the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants made and/or caused or permitted the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls. As a result, Defendants' public statements were materially false and misleading at all relevant times, and caused an artificial inflation of Ocular's stock price.

21.     The Individual Defendants failed to correct and/or caused or permitted the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

22.     Moreover, during the Relevant Period, the SV Entities, funds affiliated with Defendants Bruce Peacock and James Garvey, sold 340,388 shares of Company stock at

artificially inflated prices while Peacock and Garvey knew of, or had access to, concealed, material information about the Company's regulatory issues. As a result, it is unlawful for the SV Entities to retain the profits made from their sales of Ocular stock.

23.     Due to the Individual Defendants' misconduct, which has subjected the Company, to being named as a defendant in three federal securities class action lawsuits pending in the United States District Court for the District of Massachusetts (the "Securities Class Actions"), the Company has suffered substantial damages, and will suffer more, due to the need to undertake internal investigations; the increased cost of capital (including increased dilution from the need to sell shares at depressed prices due to a "credibility discount"); and losses due to compensation payments to all or some of the Individual Defendants, who were improperly over-compensated by the Company despite their failure to perform their job functions.

24.     The Company's substantial damages to date will be increased by any defense costs, settlements or judgments it may have to pay in connection with the class actions. All such damages are attributable to Individual Defendants' bad faith breaches of fiduciary duty.

25.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and certain Individual Defendants' liability in the Securities Class Actions, their (in many cases) being beholden to each other as discussed below, and certain longstanding business and personal relationships as detailed *infra,* a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence. In order to

establish demand futility under Dealware law, only 4 of 8 directors need to be shown to lack independence.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who is a citizen of Delaware or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

30.     Venue is proper in this District because Ocular and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

31.     Plaintiff is a current shareholder of Ocular common stock. Plaintiff has continuously held Ocular common stock at all relevant times. Plaintiff is a citizen of Tennessee.

8

**Nominal Defendant Ocular**

32.     Nominal Defendant Ocular is a Delaware corporation with its principal executive offices at 15 Crosby Drive, Bedford, Massachusetts 01730. The Company conducts research and development, in addition to designing and manufacturing products and solutions. Ocular trades on the NASDAQ under the ticker symbol "OCUL."

**Defendant Sawhney**

33.     Defendant Amarpreet Sawhney ("Sawhney") has served as the Company's CEO and President from 2006 to September 2017, and as the Chairman of the Board since June 2014. Since September 2017, he has served as an at-will employee as the Company's Executive Chairman of the Board. According to a Form 8-K filed by the Company with the SEC on June 22, 2017 (the "June 22, 2017 8-K"), Defendant Sawhney was replaced as President and CEO of the Company by successor President and CEO Antony Mattessich effective August 1, 2017. According to the Company's Schedule 14A filed with the SEC on April 20, 2017 (the "2017 Proxy Statement") and insider trading records, Defendant Sawhney beneficially owned about 3,273,231 shares of the Company's common stock on March 31, 2017, which was about 11.1% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Sawhney owned over $30 million worth of Ocular stock.

34.     He is a citizen of Massachusetts.

35.     For the fiscal year ended December 31, 2016, Defendant Sawhney received $1,747,328 in compensation from the Company, including more than $775,000 in cash and nearly $1 million worth of stock options. Sawhney's base salary for 2016 was $540,788.

36.     According to the 2017 Proxy Statement, Defendant Sawhney was eligible for a discretionary annual cash bonus of up to 55% of his base salary based on his prior year performance. For the first quarter of 2017, Defendant Sawhney received a discretionary cash bonus of $237,946 based on his performance in 2016.

37.     The Company's 2017 Proxy Statement stated the following about Defendant Sawhney:

> ***Amarpreet Sawhney, Ph.D.*** has served as our President and Chief Executive Officer and as a member of our board of directors since 2006. He has served as the Chairman of our board of directors since June 2014. From 2008 to April 2014, Dr. Sawhney also served as Chief Executive Officer of Augmenix, Inc., a biopharmaceutical company, which was, up until April 2014, an affiliate of Ocular through Dr. Sawhney's service as Chief Executive Officer of both entities. Dr. Sawhney is also a general partner of Incept, LLC, an intellectual property holding company. Prior to joining Ocular Therapeutix, Dr. Sawhney founded and served as the President and Chief Executive Officer of Confluent Surgical, Inc., a medical device company, from 1998 to 2006 when it was acquired by Covidien plc. He served as a member of the board of directors of AccessClosure, Inc., a medical device company, from 2002 to 2009. Previously, he was a technical founder of Focal, Inc., a biopharmaceutical company subsequently acquired by Genzyme Corporation. Dr. Sawhney holds a Ph.D. and M.S. in Chemical Engineering from the University of Texas at Austin and a B.Tech. in Chemical Engineering from the Indian Institute of Technology, Delhi, India. We believe that Dr. Sawhney is qualified to serve on our board of directors because of his extensive executive leadership experience in the life sciences industry and his extensive knowledge of our company based on his position as President and Chief Executive Officer.

38.     Defendant Sawhney is a general partner of Incept, LLC ("Incept"), with which Ocular has a license agreement to use and develop certain patent rights (the "Incept Licensing Agreement"). The Company and any of the Company's sub-licensees are obligated to pay royalties on net sales of commercial products developed using the licensed technology. Through March 31, 2017, the royalties paid for product sales under the Incept Licensing Agreement totaled $111,000.

**Defendant Ankerud**

39.     Defendant Eric Ankerud ("Ankerud") has served as the Company's Excutive Vice President of Regulatory, Quality, and Compliance ("EVP-RQC") from February 2016 to July 2017. According to the most recent Form 4 filed by Defendant Ankerud with the SEC on March 6, 2015, as of July 30, 2014 Ankerud beneficially owned 78,651 shares of the Company's common stock. Given the price per share of the Company's common stock at the beginning of the Relevant Period, $7.63, Ankerud owned over $600,000 worth of Ocular stock.

40.     Upon information and belief, he is a citizen of New Hampshire.

41.     For the fiscal year ended December 31, 2016, Defendant Ankerud received $330,000 in base salary from the Company.

42.     According to the 2017 Proxy Statement, Defendant Ankerud was also eligible for a performance bonus worth up to 35% of his base salary based on the performance of the company.

43.     The 2017 Proxy Statement stated the following about Defendant Ankerud:

*Eric Ankerud* has served as our Executive Vice President, Regulatory, Quality and Compliance, since February 2016. Previously, Mr. Ankerud served as our Executive Vice President, Clinical, Regulatory and Quality from 2007 to January 2016. From 2008 to April 2014, Mr. Ankerud also served as Executive Vice President, Clinical, Regulatory and Quality, of Augmenix, Inc. Prior to joining Ocular Therapeutix, Mr. Ankerud served as the Vice President, Clinical, Regulatory and Quality, of Confluent Surgical, Inc., the Vice President, Corporate Regulatory Affairs, of Boston Scientific Corporation, the Vice President, Quality, Regulatory and Clinical Affairs, of Summit Technology, Inc., a medical device company, and the Director, Corporate Regulatory Affairs, of Bausch & Lomb. Previously, he held various senior management roles with the surgical products and infusion pump divisions of C.R. Bard, a medical device manufacturer. Mr. Ankerud holds a B.A. in Economics from St. Lawrence University and a J.D. from the State University of New York at Buffalo.

### Defendant Chadha

44.     Defendant Jaswinder Chadha ("Chadha") has been a Company Director since 2013 and, according to the 2017 Proxy Statement, is a cousin of Defendant Sawhney. According to the 2017 Proxy Statement, as of March 31, 2017 Defendant Chadha beneficially owned 171,361 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Chadha owned over $1.5 million worth of Ocular stock.

45.     Upon information and belief, he is a citizen of New Jersey.

46.     For the fiscal year ended December 31, 2016, Defendant Chadha received $147,466 in compensation from the Company. This included $37,500 in cash and $109,966 in stock options.

47.     The 2017 Proxy Statement stated the following about Defendant Chadha:

*Jaswinder Chadha* has served as a member of our board of directors since 2013. Mr. Chadha founded and has served as the President and Chief Executive Officer of Axtria, Inc., an analytics company, since 2009. Prior to founding Axtria, Mr. Chadha was a co-founder and served as President and Chief Executive Officer of marketRx Inc., a market research and analytics firm subsequently acquired by Cognizant Technology Solutions, from 2000 to 2009. Mr. Chadha holds a B.Tech. in Mechanical Engineering from the Indian Institute of Technology, Delhi, India. We believe that Mr. Chadha is qualified to serve on our board of directors because of his extensive experience in sales and marketing strategy in the life sciences industry.

48.     Defendant Chadha is the co-founder and CEO of Axtria, Inc. ("Axtria"), with which the Company entered into a Master Services Agreement for Axtria to provide certain sales and marketing analytics to the Company (the "Axtria Agreement"). In February 2017, Ocular entered into a statement of work totaling approximately $1.4 million in which Axtria would

provide data warehouse implementation, operations and maintenance support services to Ocular. Through March 31, 2017, payments made to Axtria under the Axtria Agreement were $388,000.

**Defendant Garvey**

49.    Defendant James Garvey ("Garvey") was a Company Director, Chair of the Nominating and Corporate Governance Committee, and member of the Company's Audit Committee from 2010 until his resignation on June 19, 2017, according to the Form 8-K filed by Ocular with the SEC on June 22, 2017. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Garvey beneficially owned 1,622,251 shares of the Company's common stock, which was about 5.6% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Garvey owned over $15 million worth of Ocular stock.

50.    Upon information and belief, he is a citizen of Florida.

51.    For the fiscal year ended December 31, 2016, Defendant Garvey received $166,466 in compensation from the Company. This included $56,500 in cash and $109,966 in stock options.

52.    Defendant Garvey served as the CEO of SV Health Investors from 1995 to 2005, Managing Partner and CEO from 2006 to 2009, Chairman from 2010 to 2014, and became Chairman Emeritus in 2014.

53.    The 2017 Proxy Statement stated the following about Defendant Garvey:

*James Garvey* has served as a member of our board of directors since 2010. Mr. Garvey was Chief Executive Officer of SV Life Sciences Advisers, LLC from 1995 to 2005, was Managing Partner and Chief Executive Officer from 2006 to 2009, was Chairman from 2010 to 2014 and assumed the role of Chairman Emeritus in 2014. Previously, he was Managing Director for the venture capital division of Allstate Corporation, an insurance provider, President of National

Teledata, a healthcare information technology company, and President and Chief Executive Officer of Allegheny International Medical Technology, a medical device company. Mr. Garvey has also held senior management positions at Millipore Corporation, a biopharmaceutical company. He serves as a member of the boards of directors of several privately-held life sciences companies and previously served as a member of the boards of directors of the publicly-traded companies Achillion Pharmaceuticals, Inc. and Shire plc. Mr. Garvey holds a B.S. in Education from Northern Illinois University. We believe that Mr. Garvey is qualified to serve on our board of directors because of his service on the boards of directors of and his significant experience as an investor in life sciences companies and his extensive executive leadership experience.

**Defendant Heier**

54.    Defendant Jeffrey S. Heier ("Heier") has been a Company Director and member of the Nominating and Corporate Governance Committee since 2015. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Heier beneficially owned 7,576 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Heier owned over $70,000 worth of Ocular stock.

55.    Upon information and belief, he is a citizen of Massachusetts.

56.    For the fiscal year ended December 31, 2016, Defendant Heier received $149,640 in compensation from the Company. This included $39,674 in cash and $109,966 in stock options.

57.    The 2017 Proxy Statement stated the following about Defendant Heier:

*Jeffrey S. Heier, M.D.* has served as a member of our board of directors since 2015. Since 1998, Dr. Heier has worked as a vitreoretinal specialist at Ophthalmic Consultants of Boston, or OCB, a large multi-specialty ophthalmology practice with several offices in the Boston, Massachusetts area. He has served as the Director of Vitreoretinal Service of OCB since 2009 and the Director of Retina Research at OCB since 2011, and in 2016 he was appointed Co-President and Medical Director. He has also served as the Co-Director of the Vitreoretinal Fellowship at OCB/Tufts University School of Medicine since 2002 and has been a partner of the Boston Eye Surgery and Laser Center, the Cape Code Eye Surgery and Laser Center, and the Plymouth Eye Surgery and Laser Center. Dr. Heier is an advisor or consultant to several biopharmaceutical and medical device companies. Dr. Heier also serves in leadership roles of several professional organizations including as President-Elect of the New England

14

Ophthalmological Society, as Secretary of the Retinal Society, and as an executive board member of the American Society of Retina Specialists. Dr. Heier holds a B.S. in Biochemistry from Brandeis University and an M.D. from the Boston University School of Medicine. We believe that Dr. Heier is qualified to serve on our board of directors because of his background in ophthalmology, with an emphasis on back-of-the-eye conditions and diseases, which gives him a perspective that is helpful to the board for understanding our product market.

### **Defendant Lindstrom**

58.     Defendant Richard L. Lindstrom ("Lindstrom") has been a Company Director and member of the Compensation and Nominating and Governance Committees since 2012. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Lindstrom beneficially owned 84,670 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Lindstrom owned over $785,000 worth of Ocular stock.

59.     Upon information and belief, he is a citizen of Minnesota.

60.     For the fiscal year ended December 31, 2016, Defendant Lindstrom received $158,716 in compensation from the Company. This included $48,750 in cash and $109,966 in stock options.

61.     The 2017 Proxy Statement stated the following about Defendant Lindstrom:

***Richard L. Lindstrom, M.D.*** has served as a member of our board of directors since 2012. Dr. Lindstrom is a founder and director and has been an attending surgeon at Minnesota Eye Consultants P.A., a provider of eye care services, since 1989. He has served as a member of the boards of directors of Imprimis Pharmaceuticals, Inc., a pharmaceutical company, since 2014 and TearLab Corporation, a diagnostics company, since 2010 and served as a member of the board of directors of Onpoint Medical Diagnostics, Inc. from 2010 to 2013. Dr. Lindstrom has served as associate director of the Minnesota Lions Eye Bank since 1987. He is a medical advisor for several medical device and pharmaceutical manufacturers and serves on the boards of several privately-held life sciences companies. Dr. Lindstrom previously served as president of the International Society of Refractive Surgery, the International Intraocular Implant

Society, the International Refractive Surgery Club and the American Society of Cataract and Refractive Surgery. From 1980 to 1989, he served as a professor of ophthalmology at the University of Minnesota, where he is currently adjunct professor emeritus. Dr. Lindstrom holds a B.A. in Pre-Medical Studies, a B.S. in Medicine and an M.D. from the University of Minnesota. We believe that Dr. Lindstrom is qualified to serve on our board of directors because of his service on the boards of directors of other life sciences companies and his background in ophthalmology, which gives him a perspective that is helpful to the board for understanding our product market.

**Defendant O'Shea**

62.     Defendant W. James O'Shea ("O'Shea") has been a Company Director and member of the Audit Committee since 2015. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant O'Shea beneficially owned 7,576 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, O'Shea owned over $70,000 worth of Ocular stock.

63.     Upon information and belief, he is a citizen of Massachusetts.

64.     For the fiscal year ended December 31, 2016, Defendant O'Shea received $151,389 in compensation from the Company. This included $41,423 in cash and $109,966 in stock options.

65.     The 2017 Proxy Statement stated the following about Defendant O'Shea:

*W. James O'Shea* has served as a member of our board of directors since 2015. Mr. O'Shea has served as a member of the boards of directors of BTG plc, a biopharmaceutical company, since 2009 and Cardiome Pharma Corp., a pharmaceutical company, since 2014. Since June 2015, Mr. O'Shea has also served as Chairman of Cardiome. He also currently serves as a member of the boards of directors of several privately-held life sciences companies and previously served as a member of the boards of directors of publicly-traded companies Zalicus Pharmaceuticals, a biopharmaceutical company, from 2007 to 2014 and Map Pharmaceuticals, a pharmaceutical company, from 2012 to 2013 when it was acquired by Allergan plc. From 1999 to 2007, Mr. O'Shea was President and Chief Operating Officer of Sepracor Inc., a pharmaceutical company, where he was responsible for successfully building that organization's

16

commercial infrastructure. During 2007, Mr. O'Shea also served as Sepracor's Vice Chairman. Prior to Sepracor, Mr. O'Shea was Senior Vice President of Sales and Marketing and Medical Affairs for Zeneca Pharmaceuticals, a business unit of AstraZeneca plc. We believe that Mr. O'Shea is qualified to serve on our board of directors because of his service on the boards of directors of other life sciences companies and his extensive leadership experience in the biopharmaceutical and pharmaceutical sectors.

**Defendant Peacock**

66.     Defendant Bruce Peacock ("Peacock") has been a Company Director, Chairman of the Audit Committee and member of the Compensation Committee since 2014. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Peacock beneficially owned 16,412 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Peacock owned over $150,000 worth of Ocular stock.

67.     Upon information and belief, he is a citizen of Pennsylvania.

68.     For the fiscal year ended December 31, 2016, Defendant Peacock received $171,716 in compensation from the Company. This included $61,750 in cash and $109,966 in stock options.

69.     The 2017 Proxy Statement stated the following about Defendant Peacock, in relevant part:

> **Bruce A. Peacock** has served as a member of our board of directors since 2014. Mr. Peacock has served as Executive Chairman at Carma Therapeutics, a pre-clinical stage biotechnology company, since November 2016. From August 2013 to September 2014, Mr. Peacock served as the Chief Financial and Business Officer of Ophthotech Corporation, a biopharmaceutical company. He served as the Chief Business Officer of Ophthotech from September 2010 to August 2013. Since May 2006, Mr. Peacock also has served as a Venture Partner at SV Life Sciences. Mr. Peacock served as President and Chief Executive Officer of Alba Therapeutics, a biopharmaceutical company, from April 2008 to February 2011, and has served as Co-Chairman of the board of directors of Alba

Therapeutics since April 2008. Prior to joining SV Life Sciences as a Venture Partner, Mr. Peacock served as Chief Executive Officer and a director of The Little Clinic, a medical care services company.

70.     Defendant Peacock has served as a partner of SV Health Investors for over 10 years, and sits on the Board as a designee of the SV Entities.

**Defendant Warden**

71.     Defendant Charles Warden ("Warden") has been a Company Director, Chair of the Compensation Committee, and member of the Audit Committee since 2015. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Warden beneficially owned 2,232,428 shares of the Company's common stock, which was about 7.7% of the Company's issued and outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $9.28, Warden owned over $20.7 million worth of Ocular stock.

72.     Upon information and belief, he is a citizen of California.

73.     For the fiscal year ended December 31, 2016, Defendant Warden received $183,696 in compensation from the Company. This included $74,000 in cash and $109,966 in stock options.

74.     The 2017 Proxy Statement stated the following about Defendant Warden:

***Charles Warden*** has served as a member of our board of directors since 2008. Mr. Warden has served as a Managing Director at Versant Ventures since 2004. Prior to Versant, he was a General Partner at Schroder Ventures Life Sciences (now SV Life Sciences), where he worked from 1996 to 2004. Previously, Mr. Warden served as an associate with Boston Capital Ventures and as a consultant with Monitor Company. He serves on the boards of several privately-held life sciences companies and also has been involved with ForSight Labs, an ophthalmic incubator, The Foundry, a medical device incubator, and The Innovation Factory, a medical devices incubator. Mr. Warden holds a B.A. in Economics and Classics from Beloit College and an M.B.A. from Harvard University. We believe that Mr. Warden is qualified to serve on our board of

directors due to his service on the boards of directors of and significant experience as an investor in life sciences companies.

75.     Defendant Warden worked at and served as a General Partner at a predecessor entity of SV Health Investors from 1996 to 2004.

**The SV Entities**

76.     The SV Entities are investment funds formed and controlled by the venture capital firm SV Health Investors, which are registered in Delaware and/or formed under Delaware law. The SV Entities maintain their executive offices at One Boston Place, 201 Washington Street, Suite 3900, Boston, MA 02108. The SV Entities at one point held over 16% of the Company's stock.

77.     The SV Entities are citizens of Massachusetts.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

78.     Ocular is a biopharmaceutical company focused on developing and commercializing innovative therapies for eye diseases and conditions using its proprietary hydrogel platform technology.

79.     DEXTENZA is one of the Company's two lead product candidates, designed for the treatment of post-surgical ocular inflammation and pain, allergic conjunctivitis and dry eye disease. DEXTENZA is an extended-delivery, drug-eluting, preservative-free intracanalicular insert that is placed into the canaliculus through a natural opening called the punctum located in the inner portion of the eyelid near the nose.

80.     Ocular is currently seeking FDA approval for DEXTENZA for the treatment of post-surgical ocular pain. As discussed further herein, the Company has repeatedly failed in its attempts to gain FDA approval.

81.     The Company's only listed product on its website is ReSure Sealant, approved for sealing clear corneal incisions following cataract surgery. The success of DEXTENZA is imperative to Ocular because the Company does not generate significant revenue from ReSure Sealant.

82.     The Company's Form 10-Q filed with the SEC on May 5, 2017, prior to the truth about DEXTENZA's issues coming to light, and as discussed further herein, described DEXTENZA's FDA approval process as follows:

> In September 2015, we submitted to the FDA a New Drug Application, or NDA, for DEXTENZA for the treatment of post-surgical ocular pain. On July 25, 2016, we announced that we had received a Complete Response Letter, or CRL, from the FDA regarding our NDA for DEXTENZA. On January 23, 2017, we announced that we had resubmitted our NDA. On February 22, 2017, we announced that the FDA accepted for review our NDA resubmission. The FDA determined that our NDA resubmission is a complete response and designated the NDA resubmission as a class 2, or major, review with a target action date under the Prescription Drug User Fee Act, or PDUFA, of July 19, 2017.

83.     DEXTENZA will not gain FDA approval if it cannot be manufactured in accordance with Current Good Manufacturing Practices—regulations enforced by the FDA that provide for systems that assure proper design, monitoring, and control of manufacturing processes and facilities. Per the Practices, a product must be free of potentially toxic particulates.

84.     The FDA specifically does not approve products contaminated by potentially toxic metals, such as aluminum, for use by patients.

85.     The FDA also provides guidance on the manufacture of drug products for stability,

stating in *FDA Guidance for Industry: Stability Testing For New Drug Substances and Products*:[1]

> The purpose of stability testing is to provide evidence on how the quality of a drug
> substance or drug product varies with time under the influence of a variety of
> environmental factors, such as temperature, humidity, and light, and to establish a
> retest period for the drug substance or a shelf life for the drug product and
> recommended storage conditions.

86.     The Company received the Initial Form 483 in February 2016, which

communicated several deficiencies as determined by the FDA. The Initial Form 483 made 10

"Observations," including airborne contaminants, lack of quality testing, inadequate sampling

techniques, and unknown "impurities." The Initial Form 483 further noted, "Laboratory controls

do not include the establishment of scientifically sound and appropriate test procedures designed

to assure that drug products conform to appropriate standards of identity, strength, quality and

purity."

87.     In January 2017, the Company resubmitted an NDA for DEXTENZA, and the

FDA performed a re-inspection in late April and early May 2017. The FDA recorded its

observations on the Second Form 483. The Second Form 483 was not made public by the

Company, but was obtained through a Freedom of Information Act request by analysts in or

around early July 2017.

88.     The FDA made several shocking contentions in the Second Form 483, including

shipment for commercial use of contaminated product without corrective action or timely

investigation of the cause. The Second Form 483 stated, in relevant part:

> Specifically, Your firm failed to investigate the nature of particulate matter that
> has been found in manufactured drug product. For example, Dextenza
> (Dexamethasone Punctum Plug 0.4mg) Lots…which had 224 plugs rejected due

---

[1] Available at: https://www.fda.gov/downloads/drugs/guidances/ucm073369.pdf.

to an unknown particulate matter, which had 45 plugs rejected due to unknown particulate matter, and which had 37 plugs rejected due to unknown particulate matter, were released for intended commercial use on 12JAN2017 without an investigation or risk assessment on drug quality or product safety. Your firm initiated an investigation on 28APR2017 after product release when you noted that particulate matter in these lots appeared inclusive of aluminum.

***

Specifically, your sampling plan supporting product release and stability testing is not designed to assure that samples are representative of the entire subject lot or unit to be tested. Your procedure SOP 1004, Revision: C, Release of Drug Products, states that product sampling for LAL testing "should result in a random sampling of a finished production lot" and product sampling for performance testing is non-specific regarding the sampling technique. Your procedure does not include any explanation of sampling techniques or sampling distribution assured to obtain representative samples. Additionally, there were no documented sample records . . . .

89.     As detailed further herein, Ocular faced material, on-going manufacturing issues affecting DEXTENZA The Individual Defendants caused the Company to fail to disclose to its shareholders and the investing public such material issues.

**False and Misleading Statements**

**March 10, 2016 Form 10-K**

90.     On March 10, 2016, Ocular filed a Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2015 (the "2015 10-K"), which was signed by Defendants Sawhney, Chadha, Garvey, Heier, Lindstrom, O'Shea, Peacock, and Warden. The 2015 10-K failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these

manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company

failed to maintain adequate internal controls.

91.     The 2015 10-K disclosed that the Company had received the Initial Form 483. It

stated, in relevant part:

> In addition, in February 2016, as part of the ongoing review of our NDA for DEXTENZA, the FDA conducted a pre-NDA approval inspection of our manufacturing operations. As a result of this inspection, we received an FDA Form 483 containing inspectional observations focused on process controls, analytical testing and physical security procedures related to manufacture of our drug product for stability and commercial production purposes. We addressed some observations before the inspection was closed and have responded to the FDA with a corrective action plan to complete the inspection process. The FDA or similar foreign regulatory authorities at any time also may implement new standards, or change their interpretation and enforcement of existing standards for manufacture, packaging or testing of our products. Any failure to comply with applicable regulations may result in fines and civil penalties, suspension of production, product seizure or recall, imposition of a consent decree, or withdrawal of product approval, and would limit the availability of ReSure Sealant and our product candidates that we manufacture. The failure to resolve the Form 483 inspectional observations from the February 2016 inspection could result in a delay in the PDUFA date and potential approval for the NDA we have filed for DEXTENZA for the treatment of post-surgical ocular pain.

92.     Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-

14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant

Sawhney attesting to the accuracy of the 2015 10-K.

**The July 25, 2016 Press Release**

93.     On July 25, 2016, the Company issued a press release announcing that it had

received a Complete Response Letter from the FDA regarding DEXTENZA (the "7-25-16 Press

Release"). The  7-25-16 Press Release failed to disclose that: (1) the Company did not properly

address the issues identified in the Initial Form 483, and this would prevent FDA approval of

Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors

regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls.

94.     The 7-25-16 Press Release stated, in relevant part:

BEDFORD, Mass.--(BUSINESS WIRE)--Jul. 25, 2016-- Ocular Therapeutix, Inc. (NASDAQ:OCUL), a biopharmaceutical company focused on the development and commercialization of innovative therapies for diseases and conditions of the eye, today announced that it received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its New Drug Application (NDA) for DEXTENZA™ (dexamethasone insert) 0.4 mg, for intracanalicular use in the treatment of ocular pain occurring after ophthalmic surgery.

The concerns raised by the FDA pertain to deficiencies in manufacturing process and controls identified during a pre-NDA approval inspection of the Ocular Therapeutix manufacturing facility. The FDA's letter did not provide any details as to which manufacturing deficiencies identified during the facility inspection remain open since the last response submitted by the Company.

Satisfactory resolution of the manufacturing deficiencies identified during the FDA facility inspection is required before the NDA may be approved. The FDA's letter did not identify any efficacy or safety concerns with respect to the clinical data provided in the NDA nor any need for additional clinical trials for the approval of the NDA.

"We have previously responded to all requests in an effort to address the manufacturing items raised by the FDA during the application process, and we await completion of the review," said Amar Sawhney, Ph.D., President, Chief Executive Officer and Chairman. "Importantly, there were no clinical issues identified in the CRL pertaining to efficacy or safety related to the post-surgical pain indication. Labeling discussions with the FDA are ongoing. We remain optimistic that DEXTENZA will be approved once these open manufacturing items are closed. We will continue to work collaboratively with the FDA so they can finalize their review of our NDA, and are committed to bringing DEXTENZA to market as rapidly as possible."

**The August 3, 2016 Press Release**

95.     On August 3, 2016, the Company issued a press release providing an update on the NDA for DEXTENZA (the "8-3-16 Press Release"). The 8-3-16 Press Release failed to

disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls.

96.    The 8-3-16 Press Release stated, in relevant part:

BEDFORD, Mass.--(BUSINESS WIRE)--Aug. 3, 2016-- Ocular Therapeutix, Inc. (NASDAQ: OCUL), a biopharmaceutical company focused on the development and commercialization of innovative therapies for diseases and conditions of the eye, today provided an update on the status of its New Drug Application (NDA) for DEXTENZA™ (dexamethasone insert) 0.4 mg, for intracanalicular use in the treatment of ocular pain occurring after ophthalmic surgery.

On July 25, 2016, Ocular Therapeutix announced that it received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its NDA for DEXTENZA that identified issues pertaining to deficiencies in the manufacturing process and controls identified during a pre-NDA approval inspection of the Company's manufacturing facility. The CRL for DEXTENZA did not identify any efficacy or safety concerns with respect to the clinical data provided in the NDA nor any need for additional clinical trials for the approval of the NDA.

Recently, the FDA issued a letter to Ocular Therapeutix noting that corrective actions detailed in its responses as a whole appear to address the ten inspectional observations raised in the Form FDA 483 with one exception which relates to the proposed process for identity testing of an incoming inert gas component used in the manufacturing process. In this letter, the FDA also requested that the Company provide evidence (e.g., a final report) when migration to automatic integration of analytical testing is complete, which is anticipated during the third quarter of 2016.

"We are working closely with the FDA to address the one remaining item and are planning for a resubmission to our NDA as soon as possible," said Amar Sawhney, Ph.D., President, Chief Executive Officer and Chairman. "We remain committed to bringing DEXTENZA to market as rapidly as possible."

**The August 9, 2016 Press Release**

97.     On August 9, 2016, the Company issued a press release announcing its financial results for the quarter and six months ended June 30, 2016 (the "8-9-16 Press Release"). The 8-9-16 Press Release failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls.

98.     The 8-9-16 Press Release provided an update on the NDA submission process for DEXTENZA, stating, in relevant part:

> "Regarding our NDA for DEXTENZA for the treatment of post-surgical ocular pain, labeling discussions with the FDA are ongoing, and as we just announced, we are working to resolve the one remaining open manufacturing observation identified by the FDA in connection with their facility inspection. We will continue to work collaboratively with the FDA so they can finalize their review of our NDA, and we remain committed to bringing DEXTENZA to market."

**Recent Highlights and Anticipated Near-Term Milestones for Key Development Programs**

***DEXTENZA for the treatment of post-surgical ocular inflammation and pain***

•     A New Drug Application (NDA) for DEXTENZA (dexamethasone insert) 0.4 mg, for intracanalicular use in the treatment of ocular pain occurring after ophthalmic surgery is pending with the U.S. Food and Drug Administration (FDA).

o     In July 2016, Ocular Therapeutix received a complete response letter (CRL) from the FDA that identified issues pertaining to deficiencies in the manufacturing process and controls, originally identified during a pre-NDA approval inspection of the Company's manufacturing facility. The CRL for DEXTENZA did not identify efficacy or safety concerns with respect to the

clinical data provided in the NDA nor any need for additional clinical trials for the approval of the NDA.

o      The FDA recently issued a letter noting that the corrective actions detailed in the Company's responses as a whole appear to address the ten inspectional observations raised in the Form 483 with one exception which relates to the proposed process for identity testing of an incoming inert gas component used in the DEXTENZA manufacturing process. The FDA also requested that the Company provide evidence (e.g., a final report) when migration to automatic integration of analytical testing is complete, which is anticipated during the third quarter of 2016.

### **November 9, 2016 Form 10-Q**

99.    On November 9, 2016, the Company filed a Form 10-Q with the SEC for the quarter and nine months ended September 30, 2016 (the "3Q 2016 10-Q"). The 3Q 2016 10-Q failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls.

100.   Instead, the 3Q 2016 10-Q commented on the Complete Response Letter the Company had received from the FDA, as announced in the 7-25-16 Press Release:

> On July 25, 2016, the Company announced that it had received a Complete Response Letter, or CRL, from the FDA regarding the NDA for DEXTENZA. In the CRL, the concerns raised by the FDA pertain to deficiencies in manufacturing process and controls identified during a pre-NDA approval inspection of the Company's manufacturing facility in February 2016 that were documented on FDA Form 483. The CRL did not provide any details as to which manufacturing deficiencies identified during the facility inspection remained open since the last response submitted by the Company. The CRL did not identify any efficacy or safety concerns with respect to the clinical data provided in the NDA nor any need for additional clinical trials for the approval of the NDA. On August 3, 2016, the

Company announced that it had received a letter ("FDA District Office Letter") from the FDA New England District Office ("District Office") providing additional details pertaining to the manufacturing facility inspection observations. The FDA District Office Letter stated that the corrective actions included in the Company's prior responses appear as a whole to adequately address the ten inspectional observations raised in the Form 483 letter the Company received in February 2016 from the FDA, with one exception which relates to the proposed process for identity testing of an incoming inert gas component used in the Company's manufacturing process. The FDA District Office Letter also requested evidence (e.g., a final report) when the planned migration of analytical testing from manual to an automatic integration is complete. There were no other issues identified in the FDA District Office Letter. The Company has had ongoing communications with the FDA including the New England District Office and offices within the Center for Drug Evaluation and Research ("CDER"), including the Office of Process and Facilities, with regard to manufacturing issues and the Company's plans for a resubmission of its NDA.

101.    The 3Q 2016 10-Q further commented on the Company's discussions with the

FDA concerning resubmission of the NDA for DEXTENZA:

In October 2016, the Company met with the FDA to discuss plans for resubmission to the NDA and to attempt to gain clarity on the possibility of a re-inspection of the Company's manufacturing facility. The FDA indicated that a decision as to whether a re-inspection is needed will be made during their review of the Company's resubmission. The Company anticipates the close-out of corrective actions to address the FDA District Office Letter and the resubmission of the NDA in the fourth quarter of 2016. Adequate resolution of the outstanding Form 483 manufacturing deficiencies is a prerequisite to the approval of the NDA for DEXTENZA, although the final decision as to the adequacy of the Company's manufacturing processes is made by CDER as part of the NDA review process. The Company anticipates that the FDA will classify the resubmission of the NDA and determine whether a re-inspection is needed within 30 days of the NDA resubmission date. The Company expects that a decision by the FDA to conduct a re-inspection of the Company's manufacturing facility would result in a classification of the resubmission of the NDA as a class 2, or major review, and would take up to 6 months to complete. If no re-inspection is needed, the Company expects the FDA to classify the NDA resubmission as a class 1, or minor review, and take approximately 2 months to complete.

102.    Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendant

Sawhney, attesting to the accuracy of the 3Q 2016 10-Q.

**The January 23, 2017 Press Release**

103.    On January 23, 2017, the Company issued a press release announcing that it had

resubmitted its NDA for DEXTENZA (the "1-23-17 Press Release"). The 1-23-17 Press Release

failed to disclose that: (1) the Company did not properly address the issues identified in the Initial

Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the

Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing

issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these

manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company

failed to maintain adequate internal controls.

104.    The 1-23-17 Press Release stated, in relevant part:

BEDFORD, Mass.--(BUSINESS WIRE)--Jan. 23, 2017-- Ocular Therapeutix,
Inc. (NASDAQ:OCUL), a biopharmaceutical company focused on the
development and commercialization of innovative therapies for diseases and
conditions of the eye, today announced that it has resubmitted a New Drug
Application (NDA) to the U.S. Food and Drug Administration (FDA) for
DEXTENZA™ (dexamethasone insert) 0.4 mg, for the treatment of ocular pain
occurring after ophthalmic surgery. DEXTENZA is a product candidate
administered by a physician as a bioresorbable intracanalicular insert and designed
for drug release to the ocular surface for up to 30 days.

"Following productive discussions with the FDA, we are pleased to announce the
resubmission of our NDA for DEXTENZA for the treatment of ocular pain
occurring after ophthalmic surgery," said Amar Sawhney, Ph.D., President, Chief
Executive Officer and Chairman. "If DEXTENZA is approved, we believe that its
ability to provide a complete course of steroid therapy with one-time
administration in the post-surgical setting will be extremely attractive for both
ophthalmologists and patients. We continue to build our commercial organization
and infrastructure in preparation for the earliest possible launch of DEXTENZA,
subject to marketing approval."

Ocular Therapeutix resubmitted the NDA in response to a complete response letter
(CRL) the Company received from the FDA in July 2016, which identified items
pertaining to deficiencies in manufacturing process and controls. The Company
expects to receive an indication of the scope and timing of the FDA's review of

the Company's NDA resubmission within approximately 30 days. The Company believes that the FDA review period of the NDA resubmission will be up to two months if a Class 1 (minor review) designation is received and up to six months if a Class 2 (major review) designation is received. Class 1 or 2 designation is dependent on whether an FDA re-inspection of the Ocular Therapeutix manufacturing facility will be a condition of NDA approval.

### The February 22, 2017 Press Release

105.    On February 22, 2017, the Company issued a press release providing an update on Ocular's NDA for DEXTENZA (the "2-22-17 Press Release"). The 2-22-17 Press Release failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls.

106.    The 2-22-17 Press Release stated, in relevant part:

*DEXTENZA initial target market comprises nearly 4 million cataract surgeries in the U.S.*

BEDFORD, Mass.--(BUSINESS WIRE)--Feb. 22, 2017-- Ocular Therapeutix, Inc. (NASDAQ:OCUL), a biopharmaceutical company focused on the development and commercialization of innovative therapies for diseases and conditions of the eye, today announced that the Company's New Drug Application (NDA) resubmission for DEXTENZA™ (dexamethasone insert) 0.4 mg for intracanalicular use, for the treatment of ocular pain occurring after ophthalmic surgery has been accepted as a filing for review by the U.S. Food and Drug Administration (FDA). DEXTENZA is a product candidate administered by a physician as a bioresorbable intracanalicular insert and designed for drug release to the ocular surface for up to 30 days.

The FDA determined that the NDA resubmission is a complete response and designated the resubmission as a Class 2 review, with a target action date under

the Prescription Drug User Fee Act (PDUFA) of July 19, 2017 for the potential approval of DEXTENZA™.

"We are pleased the FDA has accepted our resubmission of the DEXTENZA NDA and that we now have clarity on the PDUFA target action date. We look forward to advancing this process toward our goal of the potential approval and commercial launch of DEXTENZA," said Amar Sawhney, Ph.D., President, Chief Executive Officer and Chairman. "With nearly four million cataract surgeries performed in the U.S. in 2016 as our initial target, the market opportunity for DEXTENZA is significant. If approved, we believe DEXTENZA will be the first non-invasive therapy available to patients and ophthalmologists that can provide a full post-operative course of therapy with a single placement."

### The May 5, 2017 Press Release

107.   On May 5, 2017, the Company issued a press release announcing its financial results for the fiscal quarter ended March 31, 2017 (the "5-5-17 Press Release"). The 5-5-17 Press Release disclosed that the Company received the Second Form 483 related to DEXTENZA. The 5-5-17 Press Release failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls. It instead vaguely addressed manufacturing issues related to DEXTENZA's production, and that the resolution of these issues was a critical component of the FDA's approval of the drug.

108.   In the 5-5-17 Press Release the Company stated, *inter alia*, "[f]ollowing a re-inspection of manufacturing operations by the FDA which was completed earlier this week, Ocular Therapeutix received an FDA Form 483 containing inspectional observations focused on

procedures for manufacturing processes and analytical testing, related to manufacture of drug product for commercial production."

109.    The 5-5-17 Press Release stated, in relevant part:

**Ocular Therapeutix™ Reports First Quarter 2017 Financial Results**

***PDUFA Target Action Date of July 19, 2017 for the DEXTENZA™ NDA for the Treatment of Ocular Pain Following Ophthalmic Surgery; Commercial Launch Preparation Activities Underway***

***Enrollment Continues in First Phase 3 Clinical Trial of OTX-TP (travoprost insert) for the Treatment of Glaucoma and Ocular Hypertension***

***Conference Call Today at 8:30 am Eastern Time***

BEDFORD, Mass.--(BUSINESS WIRE)--May 5, 2017-- Ocular Therapeutix, Inc. (NASDAQ: OCUL), a biopharmaceutical company focused on the development, manufacturing and commercialization of innovative therapies for diseases and conditions of the eye, today announced financial results for the first quarter ended March 31, 2017.

"This is an important time for Ocular Therapeutix as we approach the PDUFA target action date for our lead product candidate, DEXTENZA, for the treatment of ocular pain following ophthalmic surgery," said Amar Sawhney, Ph.D., President, Chief Executive Officer and Chairman. "Should DEXTENZA be approved, its commercial launch will enable our transition into a fully-integrated, commercial-stage, revenue-generating company. DEXTENZA has now been extensively studied for the treatment of post-surgical ocular pain and inflammation in over 550 clinical trial participants. If approved, we believe DEXTENZA will address the compliance issues associated with steroid eyedrops and serve as an attractive alternative for both patients and ophthalmologists."

Recent Highlights and Anticipated Near-Term Milestones for Key Development Programs

DEXTENZA™

- A New Drug Application (NDA) for DEXTENZA (dexamethasone insert) 0.4mg for intracanalicular use is currently under review by the U.S. Food and Drug Administration (FDA) for the treatment of ocular pain following ophthalmic surgery. The FDA has set a target action date under the Prescription Drug User Fee Act (PDUFA) of July 19, 2017 for a decision regarding the potential approval of DEXTENZA. **Following a re-inspection of manufacturing operations by the FDA which was completed earlier this week, Ocular Therapeutix received an FDA Form 483 containing inspectional observations focused on procedures for manufacturing processes and analytical testing, related to manufacture of drug product for commercial production.** The Company plans to evaluate and respond to the FDA within 15 days with corrective action plans to complete the inspection process. Adequate resolution of the outstanding Form 483 inspectional observations is a prerequisite to the approval of the NDA for DEXTENZA.
- Subject to the approval of the NDA for post-surgical ocular pain by the FDA, Ocular Therapeutix intends to submit an NDA supplement for DEXTENZA to broaden its label to include an indication for post-surgical ocular inflammation.

- Ocular Therapeutix plans to present additional data from its most recent Phase 3 study evaluating the efficacy and safety of DEXTENZA for the treatment of ocular pain and inflammation following cataract surgery, at the upcoming American Society of Cataract and Refractive Surgery (ASCRS) Annual Meeting, being held today through Tuesday, May 9, in Los Angeles, CA.
- Additional presentations will be made at the meeting regarding recent positive results of a patient experience study of DEXTENZA as well as the importance of the assessment of ocular pain.

- In addition, DEXTENZA is in Phase 3 clinical development for the treatment of allergic conjunctivitis. In May 2017, the Company initiated a non-significant risk device study to confirm the effect on efficacy of the placebo insert used in previous studies compared with a rapidly resorbing placebo insert.
- Subject to favorable results from this study, the Company plans to conduct an additional Phase 3 clinical trial to further evaluate DEXTENZA for the treatment of allergic conjunctivitis.

(Emphasis added).

### May 5, 2017 Earnings Call

110.    After issuing the 5-5-17 Press Release, the Company held an earnings conference call the same day (the "5-5-17 Earnings Call"). During the 5-5-17 Earnings Call, Defendants Ankerud and Sawhney answered questions about the Second Form 483's issuance and its effect

on FDA approval of DEXTENZA. Despite these exchanges, the 5-5-17 Earnings Call failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls.

111.    During the 5-5-17 Earnings Call, Defendant Ankerud assured investors that Ocular would be able to address issues raised by the Second Form 483. Specifically, Ankerud represented that the Company "ha[d] the situation under control" and could "resolve the Form 483 issues in a timely manner." This statement was affirmatively false and misleading in that it characterized Ocular as having the Second Form 483 issues "under control," as the truth was that DEXTENZA was facing considerable manufacturing issues that would ultimately endanger FDA approval.

112.    During the 5-5-17 Earnings Call Defendant Ankerud stated, in relevant part:

Good morning, Ken. Thanks for the question. **FDA completed the re-inspection of our facility as part of the NDA review late yesterday afternoon. As Amar mentioned, 483 was issued**. We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues. This was a new investigator not the same investigator from prior inspections, and their primary focus in the 483 relates to a particular matter issue as part of our manufacturing process. The issue relates primarily to completion of an investigation that we have underway in regard to the particular matter solidifying specifications for in process, 100% visual inspection of our inserts, as well as enhancing our operator training. **We feel quite comfortable that we have the situation under control and we are preparing responses to the 483 as of this morning in anticipation of responding within 15 calendar days to the agency.** In addition to the particular matter issue, FDA raised a couple of observations in regard to analytical method, testing to be completed, as well as some other issue related to quality oversight of batch records. So in summary, we

34

believe that each of the observations raised by FDA during this continuous improvement review of our fully developed manufacturing process are handled well and will be resolved in our response to FDA. We're also pleased that the collaborative nature of our NDA review has continued between the various offices of FDA, and we're marching toward that PDUFA date and **expect that we can resolve the 483 issues in a timely manner.**

(Emphasis added).

113.    During the 5-5-17 Earnings Call, in an exchange with an analyst that inquired about the Second Form 483's issuance, Defendant Sawhney also asserted his confidence that Ocular would be able to address the issues raised by the Second Form 483. This statement was affirmatively false and misleading because it mischaracterized the issues raised by the Second Form 483 as "resolvable," which the Individual Defendants knew to be untrue and was ultimately shown to be false through the FDA's forthcoming denial of Ocular's NDA for DEXTENZA as discussed herein.

114.    Further, Defendant Sawhney had the following exchange with an analyst during the 5-5-17 Earnings Call:

[Analyst]

Okay. Is there anything in their observations that you think could delay the action date specifically?

[Defendant Sawhney]

Nothing that we can currently see. I think these – as you know, probably 90% plus inspections have 483. **The question is one of the nature of the issues in the 483, we think these are resolvable issues, and we have responses.** Some already prepared and some being prepared to address them in a timely fashion.

(Emphasis added.)

## The Truth Emerges

### The July Exposé

35

115.    On July 6, 2017, *Seeking Alpha* published the July Exposé reporting Ocular's manufacturing issues. The July Exposé addressed issues related to Form 483s issued to Ocular regarding its DEXTENZA manufacturing process. Specifically, the July Exposé highlighted that Ocular's management misled investors about DEXTENZA's manufacturing issues, including that more than 50% of the lots of DEXTENZA manufactured by Ocular contained bad product and that DEXTENZA's approval by the FDA would be imperiled due to manufacturing issues raised by the Second Form 483. The July Exposé noted that the Company clearly had manufacturing issues, and that Ocular's management was misleading investors, stating, in relevant part:

**Ocular: A Poke In The Eye**
Jul. 6, 2017 3:09 PM ET239 comments

Summary

- Dextenza unlikely to get approved by the FDA on July 19 PDUFA date.

- Management has been misleading investors about manufacturing.

- OCUL's hydrogel technology is worthless at the moment.

I used to be an investor in Ocular Therapeutix (NASDAQ:OCUL) because the risk/reward was highly attractive and the company had a lot of potential.

Unfortunately, management has failed to execute and brought the company to the brink of collapse. It is not surprising to me that the ENTIRE senior management has resigned recently (CFO, CMO and CEO).

**Dextenza Manufacturing Issues**

OCUL has disclosed that they received a second 483 from the FDA after their facility reinspection. Even a layperson reading this can tell that the company is having serious manufacturing issues, and their whole approach to manufacturing and patient safety is highly questionable. What's more troubling is that either management doesn't fully understand the letter, or they have been misleading investors. Both are bad.

On their last earnings call. management made a number of statements regarding the 483 and the company's manufacturing process:

"*We were pleased during the re-inspection that the FDA investigator was able to confirm our corrective action plan from prior observations, and indicated that there was no further follow-up necessary to close out those issues.*" Ocular Therapeutix's CEO Amar Sawhney on Q1 2017 Results - Earnings Call Transcript.

"*So I think that's a strong sign that the manufacturing process has move forward significantly, and is in a fully developed mode.*"

The CEO concluded:

"*Also remembering that this is a new investigator, different one that came last time. So when you have a different one coming, they confirm what the prior one did, and then they probably have some additional helpful suggestions.*"

(Emphasis in original.)

116.   The July Exposé also revealed Ocular had received two Form 483s from the FDA,

that laboratory controls were repeatedly found to be inadequate, and that "not only did [Ocular]

not resolve prior issues, but have committed worse transgressions." The July Exposé stated, in

relevant part:

Now, let's look at reality:

**First**, OCUL has **REPEAT** observations. Not only did they not resolve prior issues, but have committed worse transgressions. Here is a copy of the first 483

**Observation 6** reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*"

**Observation 5** of the second 483 reads: "*Laboratory controls do not include the establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity.*" Sounds familiar?

**Observation 3** of the second 483 reads: "*There are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess. Specifically, your firm lacks documentation to show that your product can consistently meet specifications as you have not systemically evaluated the [redacted] lots manufactured from FEB2016 to present, of which [redacted] failed specification and were disposed of in-process*"

In plain English, this means, OCUL still doesn't know to make their product consistently. How does OCUL deal with instances when product doesn't meet specifications? They have been discarding bad manufacturing lots without investigation.

(Emphasis in original.)

117.    The July Exposé also revealed that "more than 50% of lots manufactured by OCUL contain bad product," and that the Company "ha[d] been using bad product in clinical trials and have released some into their commercial supply!" It stated, in relevant part:

**Second**, OCUL has characterized their manufacturing as "*in a fully developed mode.*" Well, Observation 1 of the second 483 reads: "*Particulate matter has been noted in 10/23 lots (intended use clinical, R&D, stability, etc.) manufactured from FEB2016 to date. The remaining [redacted] lots were scrapped prior to the visual inspection therefore their particulate status remains unknown.*"

In plain English, this means that more than 50% of lots manufactured by OCUL contain bad product. That leaves plenty of room for additional development. Sometimes, OCUL has had to discard entire lots because they were out of spec!!

**Third**, if OCUL only discarded bad product without investigation, that would be a bad thing. But in fact, they have been using bad product in clinical trials and have released some into their commercial supply!

(Emphasis in original.)

118.    Finally, due to the manufacturing issues raised by the Second Form 483, the July Exposé concluded, "IF Dextenza is possible to manufacture on a mass scale, something which hasn't been done before, OCUL needs to revamp their entire process from the ground up, which can take years to do. They need to use the proper scientific tools and procedures." As a result, the

article concluded that DEXTENZA's approval by the FDA could be imperiled. The July Exposé

stated, in relevant part:

> **Observation 1** continues: "*Particulates were not logged as product defects prior to FEB2016, therefore lots released prior to that date, such as clinical trial lots [redacted], released [redacted]respectively and used in human clinical trials are unknown with respect to particulate status.*"
>
> **Observation 2** reads: "*The following batches were released without an understanding of the defects present, more specifically, particulate matter of unknown origin and composition at the time of release: ....all three lots were released for intended commercial use on 12JAN2017 without critical defect limits*"
>
> OCUL believes that their manufacturing is "fully developed" and remaining issues can be resolved quickly. The reality is, IF Dextenza is possible to manufacture on a mass scale, something which hasn't been done before, OCUL needs to revamp their entire process from the ground up, which can take years to do. They need to use the proper scientific tools and procedures. (**Observation 5** of the second 483 says that the scales OCUL has been using aren't sensitive enough to weigh the "full range of materials")
>
> **Fourth**, calling 483 observations "helpful suggestions," reflects a lack of understanding of the FDA compliance function. I have a lot of respect for OCUL's now-former CEO. He is a brilliant person and a highly successful entrepreneur. However, the pharmaceutical world is not his, and he finally recognized that he is not the right person to develop the company further.

(Emphasis in original.)

### The *STAT* Article

119.    *STAT* also published an article on July 6, 2017 regarding Ocular and

DEXTENZA's approval concerns (the "*STAT* Article"). The *STAT* Article asserted that because

of product contamination, including aluminum, that was discovered by an FDA inspector during

a visit to Ocular's manufacturing facility, the FDA would reject DEXTENZA.

120.    The *STAT* Article stated, in relevant part:

Ocular Therapeutix is still working to resolve manufacturing problems with its eye drug Dextenza, less than two weeks before an FDA approval decision deadline.

In an interview Friday, Ocular CEO Amar Sawhney said a submission to the FDA, responding to an inspection of its Dextenza manufacturing facility in May, is not yet completed.

"We have not completely responded to the FDA but we are in the process of doing that in relatively short order," said Sawhney. Some of the issues raised by FDA about the Dextenza manufacturing and quality control process are taking more time to resolve, he added.

Ocular is running out of time. The FDA is expected to announce an approval decision for Dextenza on July 19. However, the company acknowledges FDA will not approve the drug unless the outstanding manufacturing issues are fixed. And for that to happen, FDA has to review the proposed changes to Dextenza's manufacturing process that Ocular is still working on.

"Dextenza is a unique product that has never been made by anybody else," Sawhney said. "There are quirks in the manufacturing process but we believe FDA is working with us."

121.    The *STAT* Article further noted that Defendant Sawhney had attributed the

contamination to blades used in the manufacturing process:

As reported Thursday, an FDA inspection raised concerns about batches of Dextenza contaminated with particulates, including aluminum. The FDA also cited Ocular for failing to identify the source of the contamination and not having proper inspection procedures in place to catch and reject contaminated Dextenza before the product reaches patients.

Sawhney says blades in a machine used to cut the solidified steroid into tiny implantable plugs was the source of the aluminum contamination. While some level of particulate contamination is normal and expected, Ocular fixed its machine to reduce it. The company also established new inspection procedures and reporting standards for its employees in charge of Dextenza manufacturing.

"I think we have resolved [the FDA's concerns] but we still need to write them up and submit," said Sawhney.

Ultimately, the FDA will decide if the manufacturing fixes put in place by Ocular are sufficient to allow Dextenza's approval. The FDA may also find it necessary to re-inspect Ocular's facility, which could take additional time. The FDA rejected Dextenza once previously, in July 2016, also for manufacturing problems.

"I wish there was a straight line to approval but there isn't. We're working hard to do something meaningful for patients," said Sawhney.

122.    Following the release of the July Exposé and the *STAT* Article, Ocular Therapeutix shares fell more than 30%, or $3.22 per share, over two trading days to close at $7.12 per share on July 7, 2017, damaging investors.

**The July 10, 2017 Press Release**

123.    On July 10, 2017, the Company issued a Press Release (the "7-10-17 Press Release") reporting it had submitted an amendment to its DEXTENZA submission to the FDA. As part of this amendment, Ocular requested a three-month extension to the FDA's approval target date of July 19, 2017, recognizing that its responses to the Second Form 483 would necessarily delay the FDA approval of DEXTENZA.

124.    In the 7-10-17 Press Release Ocular claimed it submitted a "close-out response to all inspectional observations in the FDA Form 483 issued in May 2017" that "focused on the characterization of particulates, defining and recognizing their source, implementing appropriate corrective and preventative actions, and revising training protocols and documents for manufacturing technicians."

125.    Also in of the 7-10-17 Press Release, the Company asserted that it "ha[d] modified a piece of manufacturing equipment referenced in the NDA resubmission and will be submitting data on new commercial batch to demonstrate that this modification, along with other improvements, has addressed outstanding issues regarding particulate matter."

**The July 11, 2017 Press Release**

126.    The Company issued a press release After the close of trading on July 11, 2017 announcing that it had received a Complete Response Letter from the FDA which stated that "the

41

FDA has determined that **it cannot approve the NDA [for DEXTENZA] in its present form**,"
thus denying Ocular's application for DEXTENZA approval (the "7-11-17 Press Release")
(Emphasis added).

127.    In the 7-11-17 Press Release, Ocular also noted that "the FDA did not have an
opportunity to review the Company's close-out response prior to" denying Ocular's application
for DEXTENZA approval.

128.    The 7-11-17 Press Release stated, in relevant part:

BEDFORD, Mass.--(BUSINESS WIRE)--Jul. 11, 2017-- Ocular Therapeutix™,
Inc. (NASDAQ:OCUL), a biopharmaceutical company focused on the
development, manufacturing and commercialization of innovative therapies for
diseases and conditions of the eye, announced today that it received a Complete
Response Letter (CRL) from the U.S. Food and Drug Administration(FDA),
regarding its resubmission of a New Drug Application (NDA) for DEXTENZA™
(dexamethasone insert) 0.4mg for the treatment of ocular pain following
ophthalmic surgery. The CRL states that the FDA has determined that it cannot
approve the NDA in its present form.

The CRL from the FDA refers to deficiencies in manufacturing processes and
analytical testing related to manufacture of drug product for commercial
production identified during a pre-NDA approval inspection of the Ocular
Therapeutix manufacturing facility that was completed in May 2017. As
previously announced on July 10, 2017, the Company submitted a response
intended to close out all inspectional observations included in the Form FDA-483
issued in May 2017. The Company also submitted details of a manufacturing
equipment change on July 10, 2017 as an amendment to the NDA resubmission
and requested that this be considered a major amendment that would extend the
target action date under the Prescription Drug User Fee Act (PDUFA).

The CRL acknowledges receipt of the Company's NDA amendment dated July
10, 2017 and states that the amendment was not reviewed prior to the FDA's action
of the CRL. As a result, the FDA did not have the opportunity to review the
Company's close-out response prior to issuing the CRL. In addition, as noted in
the CRL, the FDA indicated that applicable sections of the amendment submitted
by Ocular Therapeutix could be incorporated when responding to deficiencies
noted in the CRL.

Satisfactory resolution of the manufacturing deficiencies detailed in the Form FDA-483 is required before the NDA may be approved. The FDA's letter did not identify any efficacy or safety concerns with respect to the clinical data for DEXTENZA provided in the NDA nor any need for additional clinical trials for the NDA approval.

129.     On this news, Ocular shares fell $1.90 per share, or over 25%, in after-hours trading prior to market open on July 12, 2017, damaging investors.

**August 8, 2017 Earnings Call**

130.     Ocular held a conference call on August 8, 2017, discussing its financial results for the fiscal quarter ended June 30, 2017. During the call, Mattessich made several statements that directly contradicted prior statements indicating that the Company had identified the issues facing approval of DEXTENZA and that they would be handled. In fact, Mattessich stated, "the question about what needs to be done in terms of a full timeline in time and events, we're not going to go into with any granularity about what precisely needs to be done" for NDA resubmission. Moreover, in addressing the source of particulate matter (*i.e.*, the toxic metal), Mattessich stated that it was a mere "presumption" or "suspicion" that the particulate matter came from the cutting process, despite Defendant Sawhney's prior statement that the aluminum contamination came from blades used in the manufacturing process.

131.     Such statements, in addition to new CEO Mattessich stating that the Company was performing "a fairly thorough root-cause analysis" to determine where the contamination came from, contradicted a prior statement by Defendant Sawhney that manufacturing was in a "fully developed mode." In fact, Mattessich stated that he was not even sure of the amount of batches that the Company would have to produce to show the FDA that the infiltration issue had been properly addressed.

**Resignations of Executives and Officer**

132.     By the end of September 2017, the Company had experienced an exodus of key executives and officers, with Defendant Ankerud resigning as the Company's EVP-RQC in July 2017, Defendant Sawhney resigning as the Company's President and CEO, and George Migausky resigning as the Company's CFO in September 2017.

**The November 7, 2017 Press Release**

133.     On November 7, 2017, the Company issued a press release for its fiscal quarter ended September 30, 2017, reporting disappointing financial results, including a net loss of approximately $15.6 million. The press release also noted that total costs and operating expenses for the quarter were $15.7 million, as compared to $9.7 million for the same period in the year prior, "primarily due to an increase in costs associated with the Company's recent initiative to enhance operations and reduce expenses surrounding the delayed DEXTENZA launch . . . ."

134.     On this news, the price per share of Ocular stock fell 8.2%, or $0.47, to close at $5.27 on November 8, 2017.

135.     In breach of their fiduciary duties, the Individual Defendants misrepresented and failed to disclose the foregoing adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. As a result, the Company's public statements were materially false and misleading at all relevant times.

136.     Moreover, in further breach of their fiduciary duties, the Individual Defendants failed to timely correct these false and misleading statements and/or omissions of material fact.

137.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

## DAMAGES TO OCULAR

138.    As a direct and proximate result of the Individual Defendants' conduct, Ocular will lose and expend many millions of dollars.

139.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and the vast majority of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

140.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

141.    Such losses include, but are not limited to, losses of revenues caused by customers' loss of trust in the Company's business and products.

142.    As a direct and proximate result of the Individual Defendants' conduct, Ocular has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

143.    Plaintiff brings this action derivatively and for the benefit of Ocular to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ocular and unjust enrichment.

144.    Ocular is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

145.    Plaintiff is, and has been at all relevant times, an Ocular shareholder. Plaintiff will adequately and fairly represent the interests of Ocular in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

147.    A pre-suit demand on the Board of Ocular is futile and, therefore, excused. At the time of filing of this action, the Board consists of non-party Mattessich and the following seven Individual Defendants: Sawhney, Chadha, Heier, Lindstrom, O'Shea, Peacock, Warden (collectively, the "Directors" and, excluding Mattessich, the "Defendant Directors"). Plaintiff only needs to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

148.    Demand is excused as to all of the Defendant Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in, in bad faith, to make and/or cause or permit the Company to make the false and misleading statements and omissions of material fact, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

149.    In complete abdication of their fiduciary duties, the Defendant Directors in bad faith participated in making and/or causing or permitting the Company to make the materially

false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Defendant Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

150.    Additional reasons that demand on Defendant Sawhney is futile follow. Defendant Sawhney served as the Company's President and CEO from 2006 to September 2017, and as the Chairman of the Board since June 2014. Defendant Sawhney currently serves as an at-will employee of the Company as Ocular's Executive Chairman of the Board. He received lavish compensation, including $1,747,328 in 2016. Thus, as the Company admits, Sawhney is a non-independent director. According to the 2017 Proxy Statement, Defendant Sawhney was also eligible for a performance bonus of up to 55% of his base salary based on the performance of the company, further revealing his interestedness and motive in facilitating and participating in the fraud. Defendant Sawhney was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the press release and earnings call, many of which he personally made. Indeed, Defendant Sawhney is a defendant in the Securities Class Actions. As CEO, President and Board Chair during the Relevant Period, Defendant Sawhney conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a substantial likelihood of liability. His large Company stock holding, worth over $30 million on March 31, 2017, and which represented 11.1% of the Company's outstanding shares, reveals his interest in keeping the Company's stock price as high as possible. Furthermore,

due to his familial relationship with Defendant Chadha, who is his cousin, and Defendant Chadha's significant likelihood of liability due to his engagement in the scheme discussed herein, Defendant Sawhney cannot consider a demand upon the Board with the requisite disinterestedness and independence. Defendant Sawhney also lacks the requisite disinterestedness and independence due to his concurrent position as managing partner at Incept and the existence of the Incept Agreement, from which he personally benefits. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. For these reasons, too, Defendant Sawhney breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Chadha is futile follow. Defendant Chadha has been a Company director since 2013. He received lavish compensation, including $147,466 in 2016. As a long-time Director, Defendant Chadha conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a significant likelihood of liability. Defendant Chadha's large Company stock holding, worth over $1.5 million on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible. Additionally, due to his familial relationship with Defendant Sawhney, who is his cousin, and Sawhney's significant likelihood of liability due to his engagement in the scheme discussed herein, Defendant Chadha cannot consider a demand upon the Board with the requisite disinterestedness and independence. Defendant Chadha also lacks the requisite disinterestedness

and independence due to his concurrent position as CEO of Axtria and the existence of the Axtria Agreement, from which he personally benefits. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. For these reasons, too, Defendant Chadha breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Peacock is futile follow. Defendant Peacock has served as a Company director since 2014. He received lavish compensation, including $171,716 in 2016. Defendant Peacock is partner at SV Health Investors, which controls and operates the SV Entities. Thus, Defendant Peacock cannot assess whether to bring a suit against the SV Entities with independence or disinterest, who are named as defendants herein. As a long-time Director and Chair of the Audit Committee, Defendant Peacock conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a substantial likelihood of liability. His large Company stock holding, worth over $150,000 on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. Defendant Peacock, due to his position at SV Health Investors, was aware that the SV Entities planned to sell hundreds of thousands of shares of Company stock, and that if the truth about DEXTENZA emerged prior to such sales, it would harm SV Health Investors. For these reasons, too, Defendant Peacock breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on new CEO Mattessich is futile follow. Mattessich has been a Company director since June 2017, and received a $250,000 cash bonus upon his appointment. Upon replacing Defendant Sawhney in August 2017 or earlier, he became the Company's President and CEO. Mattessich will receive lavish compensation, including over $1 million in annual compensation and be eligible for a performance bonus of up to 60% of his base salary based on the performance of the Company. He is thus a non-independent director because his livelihood is dependent on his employment at the Company. Thus, Mattessich is a non-independent director. For this reason, too, demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Warden is futile follow. Defendant Warden has served as a Company director and as a member of the Audit Committee since 2015. He received lavish compensation, including $183,696 in 2016. His large Company stock holding, consisting of 7.7% of the Company's outstanding shares and worth over $20.7 million on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Director and member of the Audit Committee, Defendant Warden conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. For these reasons, too, Defendant Warden breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Heier is futile follow. Defendant Heier has served as a Company director and as a member of the Company's Nominating and

Corporate Governance Committee since 2015. He received lavish compensation, including $149,640 in 2016. His Company stock holding, worth over $70,000 on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Director, Defendant Heier conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a substantial likelihood of liability. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. For these reasons, too, Defendant Heier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Lindstrom is futile follow. Defendant Lindstrom has served as a Company director and as a member of both the Compensation and Nominating and Governance Committees since 2012. He received lavish compensation, including $158,716 in 2016. His large Company stock holding, worth over $785,000 on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Director, Defendant Lindstrom conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a substantial likelihood of liability. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. For these reasons, too, Defendant Lindstrom breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant O'Shea is futile follow. Defendant O'Shea has served as a Company director and as a member of the Audit Committee since 2015. He received lavish compensation, including $151,389 in 2016. His Company stock holding, worth $70,000 just prior to the beginning of the Relevant Period, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Director and member of the Audit Committee, Defendant O'Shea conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Thus, he faces a substantial likelihood of liability. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015 10-K referenced herein. For these reasons, too, Defendant O'Shea breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on the Board is futile follow.

159.    Demand in this case is excused because the Directors, who are named as defendants in this action, are beholden to each other. According to Ocular's Corporate Governance Guidelines, the Nominating and Corporate Governance Committee "identif[ies] individuals qualified to become Board members" and "recommend[s] to the Board the persons to be nominated for election as directors." Additionally, the Nominating and Corporate Governance Committee is expected to "have direct input from the Chairman of the Board, the Chief Executive

Officer and, if one is appointed, the Lead Director." Thus, members of this committee make decisions that directly affect other directors' participation on the Board. The Directors may fear retaliation by the Nominating and Corporate Governance Committee should Plaintiff's demand be accepted. This is especially true since two of the eight members of the Board are up for election next year. Moreover, given Defendant Sawhney's egregious misconduct and culpability, and his position of power on the Board, the remaining Directors are beholden to him and cannot act with the requisite level of independence and disinterestedness. Thus, demand upon the Board is futile.

160. The Directors have longstanding business, personal, and even familial relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. This is especially true with Defendants Sawhney and Chadha, who are cousins, and Defendants Sawhney and Warden, who have been close collaborators and friends and worked closely on investments and venture projects for almost 20 years. Defendant Warden has repeatedly invested in companies affiliated with Sawhney, including Ocular and Augmenix, Inc, where Defendant Sawhney served as CEO from 2008 to April 2014. Defendants Sawhney and Warden even formed a three-person company together in 2008. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and false and misleading statements and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

161. Defendant Warden is Chairman of Versant Ventures, a venture capital firm that has a close working relationship and frequently co-invests with SV Health Investors, and which at one point owned over 19% of the Company's stock. Thus, Defendant Warden, due to his position at Versant Ventures, cannot objectively assess whether to bring a suit against the SV

Entities or Defendant Peacock, who is a partner at SV Health Investors. For the same reason, Defendant Peacock, as a partner at SV Health Investors, also cannot objectively assess whether to bring a suit against Defendant Warden. Moreover, Defendant Peacock cannot independently or disinterestedly assess whether to bring a suit against the SV Entities, or Defendant Garvey who serves as Chairman Emeritus at SV Health Investors. Defendants Warden and Peacock, due to their current positions at venture capital firms, cannot objectively consider whether to bring a suit against the Individual Defendants and the SV Entities as it would be catastrophic to their careers if they were known to sue a well-known entrepreneur such as Defendant Sawhney, as it would likely dissuade executives from accepting venture financing from their respective firms. Thus, any demand on Defendants Warden and Peacock would be futile.

162.    Ocular has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ocular any part of the damages Ocular suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

163.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

164.   The acts complained of herein constitute violations of fiduciary duties owed by Ocular's officers and directors, and these acts are incapable of ratification.

165.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ocular's business and affairs.

168.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.   The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Ocular.

170.   In breach of their fiduciary duties, the Individual Defendants in bad faith made and/or caused or permitted the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the

Individual Defendants made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company did not properly address the issues identified in the Initial Form 483, and this would prevent FDA approval of Ocular's re-submitted NDA; (2) the Individual Defendants had been misleading investors regarding DEXTENZA's manufacturing issues, including that over 50% of Ocular-manufactured lots contained bad product; (3) these manufacturing issues endangered the FDA's approval of DEXTENZA; and (4) the Company failed to maintain adequate internal controls. As a result, Defendants' public statements were materially false and misleading at all relevant times.

171.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties. The Company's common stock was artificially inflated due to the false and misleading statements and omissions of material fact.

172.    In further breach of their fiduciary duties owed to Ocular and Ocular's shareholders, the Individual Defendants failed to maintain adequate internal controls, which facilitated the scheme to make false and misleading statements of material fact.

173.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such

facts were available to them. Such material misrepresentations and omissions were committed in bad faith.

174.     The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed in bad faith.

175.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ocular has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.     Plaintiff on behalf of Ocular has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

178.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.     By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of Ocular.

180.    The Individual Defendants either benefitted financially from the false and misleading statements, or received bonuses, stock options, or similar compensation from Ocular that was tied to the performance or artificially inflated valuation of Ocular, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

181.    Plaintiff, as a shareholder and representative of Ocular, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

182.    Plaintiff on behalf of Ocular has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused Ocular to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to investigate their misconduct and defend the Company in the Securities Class Actions, and to lose business from customers who no longer trust the Company and its products.

185.    The Individual Defendants are each liable to the Company as a result of the waste of corporate assets.

186.    Plaintiff on behalf of Ocular has no adequate remedy at law.

## FOURTH CLAIM

### Against the SV Entities for Unjust Enrichment Due to Breach of Fiduciary Duty

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    During the Relevant Period, the SV Entities held as much as 7.8% of Ocular's stock, and had two of their fiduciaries and affiliates on the Board—Defendants Peacock and Garvey. Due to Defendant Peacock's role as Chairman of the Audit Committee, the SV Entities had power and ability to exert influence and/or control over the Company's disclosures during the Relevant Period. Moreover, Defendants Peacock and Garvey had access to and knew of the Initial Form 483 and the Second Form 483, and considering how material thes Form 483s were to the Company's prospects, knew their contents.

189.    The SV Entities had access to confidential Company information, and are not permitted to profit while such information has been misrepresented or concealed. There is a strong inference, especially in light of the fact that the SV Entities' investment in the Company in 2016 was, at times, worth north of $23 million, that Defendant Peacock did not cause the disclosure of the material contents of the Initial Form 483 and the Second Form 483 in order for the SV Entities to make their planned sales of millions of dollars' worth of stock in the Company's offering.

190.    As a result, the SV Entities have been unjustly enriched, and the SV Entities are each liable to the Company.

191.    Plaintiff on behalf of Ocular has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ocular, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ocular;

(c)     Declaring that the SV Entities were unjustly enriched;

(d)     Determining and awarding to Ocular the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and the SV Entities, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)     Directing Ocular and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ocular and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Ocular to nominate at least four candidates for election to the board; and

60

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(f)    Awarding Ocular restitution from Individual Defendants, and disgorgement from the SV Entities, and each of them;

(g)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(h)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 16, 2018

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com

61

*Counsel for Plaintiff*